UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JAMES ANDERSON,<br><br>Plaintiff,<br><br>vs.<br><br>ESPERION THERAPEUTICS, INC., J. MARTIN CARROLL, SHELDON KOENIG, SETH H.Z. FISCHER, ROBERT E. HOFFMAN, STEPHEN ROCAMBOLI, JAY SHEPARD, CRAIG THOMPSON, and TRACEY M. WOODY<br><br>Defendants. | Case No. 26-cv-6915 |

**COMPLAINT**

Plaintiff James Anderson ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

**NATURE OF THE ACTION**

1. This is an action brought by Plaintiff against Esperion Therapeutics, Inc. ("Esperion" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Esperion, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9. Plaintiff's claims arise in connection with the proposed acquisition of Esperion by ARCHIMED's ("ARCHIMED") wholly

controlled subsidiary MergerCo ("Merger Sub"), an entity formed for the sole purpose of facilitating the present transaction (together with ARCHIMED and Merger Sub., "ARCHIMED").

2. On or about May 1, 2026, Catalyst entered into an agreement and plan of merger (the "Merger Agreement"), whereby ARCHIMED will acquire Esperion (the "Proposed Transaction") and shareholders of Catalyst common stock will receive $3.16 in cash for each share of each share of Catalyst common stock they own and the contingent value right to participate in up to $100 million in aggregate contingent milestone payments (the "Merger Consideration").

3. On or about June 8, 2026, in order to convince Esperion shareholders to support the Proposed Transaction, the Board authorized the filing of a Schedule 14A Definitive Proxy Statement (the "Proxy Statement") with the SEC. As detailed below, the Proxy Statement is materially incomplete and misleading.

4. The special meeting at which Esperion shareholders will cast their votes on the Proposed Transaction (the "Special Meeting") is scheduled for July 8, 2026 and the Proxy Statement that will be used to solicit votes on the Proposed Transaction has been sent to Esperion shareholders. It is imperative that the material information that has been omitted from the Proxy Statement be disclosed immediately so public stockholders may have time to consider the information that has been omitted and misrepresented and make a fully and fairly informed determination as to how to vote.

5. For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from consummating the Proposed Transaction, unless and until the material information discussed below is disclosed to Esperion shareholders, or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

7. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Vigman*, 764 F.2d at 1316.

8. Venue is proper in this Court under Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b)(2) because Defendants are subject to personal jurisdiction in this District and shareholders of Esperion reside in this District so Defendants were aware that the Proxy Statement would be reviewed in this District. *Santore v. Swaminathan*, No. 17 cv 5742, 2018 U.S. Dist. LEXIS 33352, at *23 (N.D. Ill. Mar. 1, 2018) ("the standard for establishing venue under [the Exchange Act] is not a rigorous one") (quoting *Haskett v. Reliv' Int'l.*, No 94 c 1461, 1994 U.S. Dist. LEXIS 5678, at *6 (N.D. Ill. Apr. 29, 1994)); *see also City of Miami Gen. Emples. & Sanitation Emples. Ret. Trust v. Casey*, No. 22-cv-2371, 2023 U.S. Dist. LEXIS 239991, at *4 (S.D. Ohio Mar. 27, 2023) ("The rule for establishing venue under the Securities Exchange Act is more

permissive than under 28 U.S.C. § 1391, consistent with the intent of the venue and jurisdiction provision in the securities laws 'to grant potential plaintiffs liberal choice in their selection of a forum.'") (quoting *Wayne Cnty. Emples.' Ret. Sys. v. MIC Inv. Corp.*, 604 F. Supp. 2d 969, 973 (E.D. Mich. 2009)). Further, Defendants were aware that the Proxy Statement would be reviewed in this District. *See Sarantakis v. Gruttadauria*, No. 02 c 1609, 2003 U.S. Dist. LEXIS 4002, at *23 (N.D. Ill. Mar. 17, 2003) ("Venue is appropriate in a securities case where a defendant causes false or misleading information to be transmitted into a judicial district."); *see also Oxford First Corp. v. PNC Liquidating Corp.*, 372 F. Supp. 191, 197 (E.D. Pa. Mar. 6, 1974) ("Venue will be sustained in a securities case where a defendant causes false or misleading information to be transmitted into a judicial district, even if the defendant never has been physically present in that district."); *Mitchell v. Texas Gulf Sulphur Co.*, 446 F.2d 90, 106 (10th Cir. 1971) (finding venue proper in the District of Utah where the defendant released a false and fraudulent press statement that was printed in the Wall Street Journal and was read and relied upon by the plaintiff in Salt Lake City, Utah).

## **PARTIES**

9. Plaintiff is, and has been continuously throughout all times relevant hereto, an owner of Esperion common stock.

10. Defendant Esperion is a publicly traded company incorporated in the state of Delaware. Esperion is a commercial-stage biopharmaceutical company focused on developing drug products for cardiometabolic and rare disease therapies. Esperion's common stock trades on the Nasdaq Stock Market (the "Nasdaq") under the ticker symbol "ESPR."

11. Defendant J. Martin Carroll ("Caroll") is Esperion's Chairman of the Board.

12. Defendant Sheldon Koenig ("Koenig") is the CEO and a director of the Company.

13. Defendant Seth H.Z. Fischer ("Fischer") is a director of the Company.

14. Defendant Robert E. Hoffman ("Hoffman") is a director of the Company.

15. Defendant Stephen Rocamboli ("Rocamboli") is a director of the Company.

16. Defendant Jay Shepard ("Shepard") is a director of the Company.

17. Defendant Craig Thompson ("Thompson") is a director of the Company.

18. Defendant Tracy Woody ("Woody") is a director of the Company.

19. The defendants identified in paragraphs 11 through 18 are collectively referred to as the "Individual Defendants" or the "Board."

## SUBSTANTIVE ALLEGATIONS

### A. Background of the Proposed Transaction

20. On July 16, 2024, ARCHIMED met with Defendant Koenig to discuss their respective businesses.

21. On August 27, 2024, the Company entered into mutual non-disclosure agreement with ARCHIMED to facilitate negotiations regarding a strategic transaction between the parties.

22. On November 2, 2024, ARCHIMED sent the Board a non-binding proposal to acquire all of the outstanding shares of Company common stock for $2.73 per share in cash (the "November 2024 proposal").

23. On December 5, 2024, ARCHIMED terminated discussions with the Company.

24. However, just a few months later starting in March 2025 and continuing through June 2025, the Company held several meetings with ARCHIMED to provide updates on the Company's overall business. During such meetings, ARCHIMED expressed their continued interest in the Company.

25. On July 17, 2025, ARCHIMED sent a proposal to the Board to acquire all of the

outstanding shares of the Company for $1.80 per share in case in addition to a contingent milestone payment of up to $75 million (the "July 17 proposal").

26. On July 21, 2026, Centerview informed ARCHIMED that the July 17 proposal was inadequate. However, the Board still determined that it would provide ARCHIMED with priority due diligence materials to progress negotiations.

27. On August 21, 2025, after performing more extensive due diligence, ARCHIMED sent a proposal to the Board offering to acquire all of the outstanding shares of the Company for $2.25 per share in cash in addition to participation in a contingent milestone payment of up to $120 million (the "August 21 proposal").

28. On August 25, 2025, the Board determined that it was appropriate to request the addition of a near-term, sales-based contingent milestone payment to the August 21 proposal.

29. On September 2, 2025, ARCHIMED updated its August 21 proposal to include a $2.25 per share in cash, participation in a contingent milestone payment of up to $120 million, and up to $75 million in a contingent milestone payment upon achievement of U.S. product revenues in the calendar year 2027 above $300 million and up to $350 million (the "September 2 proposal").

30. On September 15, 2025, the Board determined that because the Company's most recent-closing price was $2.78, ARCHIMED's September 2 proposal was inadequate. Thereafter, the Board ended negotiations with ARCHIMED.

31. On October 14, 2025, ARCHIMED revised its offer to acquire the Company for $3.00 per share in cash plus a contingent value right ("CVR") based on a contingent milestone payment of up to $75 million upon achievement of U.S. product revenues in the calendar year 2027 above $300 million and up to $350 million (the "October 2025 proposal").

32. On October 15, 2025, the Board countered with a request to increase the upfront

cash payment to $3.26 per share in cash.

33. On October 21, 2025, ARCHIMED increased the upfront cash payment to $3.12. In addition, ARCHIMED requested a 45-day period of exclusive negotiations.

34. On November 6, 2025, the Company and ARCHIMED entered into an exclusivity agreement.

35. On December 8, 2025, after further deliberations, the Company and ARCHIMED terminated the exclusivity agreement and ended discussions.

36. On March 3, 2026, the Company entered into a definitive agreement to acquire Cortasis. Cortasis developed and commercialized the drug product ENBUMYST. Under the terms of the agreement, the Company acquired the outstanding stock of Cortasis in exchange for a payment of $75 million in cash.

37. On March 19, 2026, ARCHIMED met with Defendant Koenig.

38. On April 1, 2026, ARCHIMED proposed to acquire the Company for $3.22 per share in cash in addition to up to $40 million in the form of a CVR tied to the U.S. product revenues for the drug products NEXLETOL/NEXLIZET in the calendar year 2027 above $300 million and up to $350 million and $60 million in the form of a CVR payable upon achievement of product revenues for drug product ENBUMSYT in excess of $200 million (the "April 2026 proposal").

39. Following the Company's acquisition of Cortasis and further negotiation, on April 26, 2026, ARCHIMED proposed an offer consisting of two options. The first option consisted of a $3.16 per share in cash in addition to the CVR payments discussed in the earlier April 2026 proposal. The second option contemplated $3.12 per share in cash in addition to ARCHIMED presenting an alternative option which contemplated an additional CVR payment. When evaluating the two options, the Board determined that the first option was better because it provided more

upfront cash value for the Company.

40. On May 1, 2026, the Company and ARCHIMED executed the Merger Agreement.

## B. The Proposed Transaction and the Issuance of the Materially Incomplete and Misleading Proxy Statement

41. On or about May 1, 2026, Esperion and ARCHIMED issued a joint press release to announce the Proposed Transaction, stating in part:

> ***Esperion to be Acquired by ARCHIMED***
>
> ***Esperion shareholders to receive $3.16 per share in cash at closing, plus the right to participate in up to $100 million in aggregate contingent milestone payments***
>
> ***Represents total equity value of up to approximately $1.1 billion***
>
> ANN ARBOR, Mich., May 01, 2026 (GLOBE NEWSWIRE) -- Esperion Therapeutics (Nasdaq: ESPR) ("Esperion," or the "Company"), a commercial-stage biopharmaceutical company dedicated to developing and delivering innovative cardiometabolic and rare/orphan disease therapies, and ARCHIMED ("ARCHIMED"), a leading investment firm focused exclusively on healthcare industries, today announced that they have entered into a definitive agreement under which funds managed by ARCHIMED will acquire Esperion in a transaction valued at up to approximately $1.1 billion in total equity value on a fully diluted basis, assuming full achievement of certain commercial-based milestones.
>
> Under the terms of the agreement, Esperion shareholders will receive $3.16 per share in cash at closing, plus the right to participate in contingent milestone payments of up to $100 million in the aggregate tied to future net sales performance. The upfront cash consideration represents a premium of 58% to Esperion's closing share price on April 30, 2026.

**Transaction Details**

> Under the terms of the agreement, an affiliate of ARCHIMED will acquire all outstanding shares of Esperion for $3.16 per share in cash at closing, plus one non-tradeable contingent value right (CVR) that will entitle the holder to participate in two contingent milestone payments of up to $100 million in the aggregate as follows:

- A contingent milestone payment based on annual U.S. net sales of certain products containing bempedoic acid (including NEXLETOL® and NEXLIZET®) in calendar year 2027 equal to (i) $40 million in the aggregate if such annual net sales are greater than $350 million or (ii) an amount between $0 and $40 million in the aggregate, determined by linear interpolation, if such annual net sales exceed $300 million but are less than $350 million; and
- A contingent milestone payment based on annual U.S. net sales of certain products containing bumetanide (including ENBUMYST®) equal to $60 million in the aggregate if such annual net sales equal or exceed $160 million in any single calendar year through December 31, 2030

**Advisors**

> Moelis & Company LLC is acting as exclusive financial advisor to ARCHIMED and Sidley Austin LLP is serving as legal advisor. Centerview Partners is acting as exclusive financial advisor to Esperion and Goodwin Procter LLP is serving as legal advisor. Akin Gump LLP is serving as legal advisor to Pharmakon Advisors.

42. On or about June 8, 2026, in order to solicit approval to consummate the Proposed Transaction from Esperion's public shareholders, the Board authorized the filing of the Proxy Statement with the SEC.

43. The Proxy Statement is materially incomplete and misleading.

**C. <u>The Preclusive Deal Protection Devices</u>**

44. The Merger Agreement contains onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

45. The Merger Agreement provides for a termination fee payable to Parent by the Company in the amount of $34,154,539 in the event the transaction is not consummated.

46. Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's stockholders will continue to suffer absent judicial intervention.

## D. The Materially Incomplete and Misleading Proxy Statement

47. The Proxy Statement is materially incomplete and misleading with respect to (i) the Company's reporting of operating income for the first quarter of 2026 in its forecasts and other financial results, and (ii) the Company's methodologies for valuing the aggregate transaction value and aggregate equity value of the various proposals submitted by ARCHIMED to acquire the Company.

### i. The Proxy Statement is Materially Incomplete and Misleading as to the Proxy Statement's Reporting of Quarterly Operating Income

48. The Proxy Statement is materially incomplete and misleading with respect to the reporting of the Company's operating income for the first quarter of 2026.

49. In its forecasts, the Company reports that its actual results for the first quarter of 2026 included Operating Income of ($25) million:

The April 2026 Forecasts for the applicable fiscal years are summarized below (USD in millions):

| | 2026E(1) | 2027E | 2028E | 2029E | 2030E | 2031E | 2032E | 2033E | 2034E | 2035E | 2036E | 2037E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Net Revenue(2) | $389 | $576 | $661 | $776 | $895 | $845 | $813 | $736 | $749 | $669 | $311 | $156 |
| Adjusted Net Revenue(3) | $214 | $374 | $493 | $593 | $769 | $763 | $723 | $642 | $641 | $644 | $304 | $155 |
| Operating Income(4) | $ (36) | $124 | $113 | $205 | $394 | $401 | $257 | $297 | $319 | $320 | $ 90 | $ 42 |

(1) Actual results for the first quarter of 2026 included Total Net Revenue of $80 million (including $43 million of U.S. net product sales of NEXLETOL/NEXLIZET) and Operating Income of ($25) million.

Proxy Statement at 62 (emphasis added).

50. This reporting of Operating Income in the forecasts is inconsistent with the Company's reporting in its Quarterly Report on Form 10-Q for the first quarter of 2026 ("Q1-Form 10-Q") filed on May 7, 2026, which reports ***Net Income (Loss)*** of ($25) million:

**Esperion Therapeutics, Inc.**
**Condensed Statements of Operations and Comprehensive Loss**
**(in thousands, except share and per share data)**
**(unaudited)**

| | Three Months Ended March 31, 2026 | Three Months Ended March 31, 2025 |
|---|---|---|
| **Revenues:** | | |
| Product sales, net | $ 43,391 | $ 34,913 |
| Collaboration revenue | 36,713 | 30,082 |
| Total Revenues | 80,104 | 64,995 |
| **Operating expenses:** | | |
| Cost of goods sold | 34,573 | 31,538 |
| Research and development | 8,988 | 12,557 |
| Selling, general and administrative | 43,124 | 42,996 |
| Total operating expenses | 86,685 | 87,091 |
| **Loss from operations** | (6,581) | (22,096) |
| Interest expense | (19,798) | (19,431) |
| Other income, net | 1,183 | 1,072 |
| **Net loss** | $ (25,196) | $ (40,455) |
| Net loss per common share - basic and diluted | $ (0.10) | $ (0.21) |
| Weighted-average shares outstanding - basic and diluted | 251,353,086 | 196,127,948 |
| **Comprehensive loss** | $ (25,196) | $ (40,455) |

https://www.sec.gov/ix?doc=/Archives/edgar/data/0001434868/000162828026032870/espr-20260331.htm#fact-identifier-205 (last accessed June 10, 2026).

51. The Proxy Statement or the Q1-Form 10-Q incorrectly reports the Company operating income (loss)/net income (loss) of approximately ($25) million.

52. As the operating income and net income are distinct financial metrics with their own unique inputs, the Proxy Statement fails to disclose whether the projected operating income and net income are distinct figures, or alternatively, whether the Proxy Statement has mistakenly confused net loss as operating income. Consequently, the stockholder cannot determine whether the operating income referenced throughout the projections in the Proxy Statement are referring to the operating

income or the net income. The Company needs to correct this erroneous and confusing financial reporting to ensure stockholders are using correct financial results to determine whether the Proposed Transaction is fair and reasonable.

### ii. The Proxy Statement is Materially Incomplete and Misleading as to the Underlying Elements considered by the Company in evaluating ARCHIMED's Multiple Proposals

53. The Proxy Statement is materially incomplete and misleading with respect to the methodologies the Company used for valuing the aggregate transaction value and aggregate equity value of the various proposals submitted by ARCHIMED to acquire the Company.

54. The Proxy Statement attempts to explain why the per share amount of ARCHIMID's July 17, 2025 acquisition proposal was lower than a November 2024 proposal by noting that at the time of the November 2024 proposal, the Company had "more cash and less debt" than in July 2025.:

> It was noted that the July 17th proposal implied an aggregate equity value for the Company (assuming maximum payout of the proposed contingent milestone payment) of approximately $470 million, with an aggregate upfront equity value of approximately $395 million, and an implied aggregate transaction value on the same basis of approximately $726 million. It also was noted that, at the time of the November 2024 proposal, the Company had ***more cash and less debt*** and, as a result, while the aggregate transaction value being offered of approximately $726 million was slightly higher on an enterprise value basis than the aggregate transaction value of the November 2024 proposal of approximately $702 million, the per share amount was lower.

Proxy Statement at 39 (emphasis added).

55. The Proxy Statement does not explain why the Company failed to apply a similar methodology in evaluating subsequent ARCHIMID proposals after July 2025 and the effect of the Company's cash and debt on various valuation categories, including aggregate transaction, aggregate equity and per share amount. For example, the Board evaluated ARCHIMED's "August 21st proposal" without considering how the Company's outstanding "cash" and "debt" may have

impacted the August 21st proposal and its potential effects on the aggregate transaction value or the per share value:

> It was noted that the August 21st proposal implied an aggregate equity value for the Company (assuming maximum payout of the proposed contingent milestone payment) of approximately $678 million, with an aggregate upfront equity value of approximately $471 million, and an implied aggregate transaction value on the same basis of approximately $917 million.

Proxy Statement at 41.

56. Similarly, the Board did not consider how the Company's "cash" and "debt" may have impacted their evaluation of ARCHIMED's "September 2nd proposal":

> It was noted that the September 2nd proposal implied an aggregate equity value for the Company (assuming maximum payout of the proposed contingent milestone payments) of approximately $756 million, with an aggregate upfront equity value of approximately $471 million, and an implied aggregate transaction value on the same basis of approximately $1,001 million.

Proxy Statement at 42.

57. In evaluating ARCHIMED's subsequent proposals after the July 17th proposal, the Proxy Statement is silent as to why the Board did not consider the Company's "cash" and "debt" to evaluate, among other factors, the aggregate equity and transaction value of the proposals and how such aggregate values would impact the per share value being offered.

58. Such information is clearly material to the reasonable stockholder. Having identified cash and debt as factors that materially impacted the economic value available to stockholders, the Proxy Statement fails to disclose whether the Board applied the same analysis when evaluating the subsequent acquisition proposals by ARCHIMED. Additionally, the reasonable stockholder cannot determine whether the Board applied a consistent evaluation method when comparing several proposals, whether factors related to the Company's capital structure may have impacted the

Board's evaluation of aggregate transaction value, or whether and how proposals following the July 17th proposal may have provided a greater or lesser value to stockholders on a per share basis.

**COUNT I**

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)**

59. Plaintiff incorporates each and every allegation set forth as if fully set forth herein.

60. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

61. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

62. The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

63. Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the misleading Proxy, which attempts to minimize the number of shares voting against the Proposed Transaction.

64. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

65. The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

66. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligent, recklessness, or intentional conduct.

67. The Company is also deemed negligent, reckless, or intentional as a result of the Individual Defendants' intent in preparing and reviewing the Proxy.

68. The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**COUNT II**

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

69. Plaintiff incorporates each and every allegation set forth as if fully set forth herein.

70. The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

71. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

72. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy contains the unanimous

recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

73. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

74. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

75. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

76. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or taking any steps to consummate the Proposed Transaction, until the Company issues curative disclosures that fully address the deficiencies in the Proxy Statement;

B. Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff rescissory damages;

C. Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

D. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E. Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: June 11, 2026

**ADEMI LLP**

By: */s/ John D. Blythin*

Guri Ademi (WI 1021729)
John D. Blythin (IL 6281648)
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel. 414-482-8000
Fax 414-482-8001
gademi@ademilaw.com
jblythin@ademilaw.com

*Attorneys for Plaintiff*